DANIEL SCHMEER, as Administrator, etc., Appellant, v. THE GAS LIGHT COMPANY of Syracuse, Impleaded, etc., Respondent.

1. NEGLIGENCE OF GAS COMPANY — ESCAPE OF GAS — QUESTION FOR JURY. The negligence of a gas company which permitted the gas to be turned into a three-story building occupied by different tenants, with pipes so arranged that each could be supplied through a separate meter, without any inspection of the pipes, after plans had been submitted to it and a meter had been provided by it upon application, after which it was the custom to permit any one to turn on the gas, is a question for the jury, where pipes in one of the rooms occupied by persons who did not use gas and had not applied for a meter were uncapped and an explosion occurred by the escape of gas therefrom.

2. EXPLOSION OF GAS — LIABILITY OF GAS COMPANY. A gas company is not an insurer against explosions of gas carried into buildings by its pipes, but is simply bound in permitting the gas to be turned into a building to exercise that degree of care which the nature of the article it deals in and the consequences to be apprehended from an accident reasonably call for.

3. CONTRIBUTORY NEGLIGENCE — SEEKING LEAK OF GAS. The contributory negligence of a boy of eighteen, injured by an explosion of escaping gas while seeking with a lighted candle to discover the leak, is a question for the jury.

Mem. of decision below, 73 Hun, 616.

(Argued October 29, 1895; decided November 26, 1895.)

APPEAL from judgment of the General Term of the Supreme Court in the fourth judicial department, entered upon an order

67

made December 8, 1893, which affirmed a judgment in favor of defendant entered upon the dismissal of plaintiff's complaint upon the merits on trial at Circuit.

This action is brought to recover damages for the death of plaintiff's son from an explosion of gas in the building in which the plaintiff had an apartment, such explosion having occurred, as is alleged, by reason of the negligence of the defendants in permitting the gas to flow into the building without first properly testing the pipes. The answer denied any negligence on the part of the company, and set up as a further defense the contributory negligence of the deceased. The plaintiff was non-suited at the trial and the General Term affirmed the non-suit, and the plaintiff appeals here. The defendant is a manufacturer of gas in the city of Syracuse and furnishes the same to all inhabitants of the city desirous of using it. The gas is supplied in the usual way by means of mains laid underground in the streets and connecting by means of service pipes with the different structures in which the gas is consumed. The company lays and owns the street mains and the service pipe therefrom to the inside of the cellar or basement of the buildings to be supplied. The service pipe is left by the company unconnected with the piping in a building, and the gas is prevented from flowing into it by means of a stopcock placed in the service pipe a short distance inside the curb at the side of the street. It has been the custom of this company to permit this service pipe to be connected with the piping in a building by the owner thereof as soon as he has made application to the company to become a consumer of the gas and after it has supplied him with a meter, and such connection has been customarily made by a gasfitter employed for that purpose by the owner, and without giving any notice thereof to the company.

In the spring of 1889, one George Young had completed the erection of a three-story brick building on the west side of North Salina street in the city of Syracuse. The building was divided into stores on the ground floor and into separate and independent apartments or flats above. There was one

double and one single store, and there were three flats upon each of the floors above the stores. The double store had been rented by the owner to a firm named Vinney & Krause, while the single store had been rented to the plaintiff for a confectionery shop, and the plaintiff had also rented one of the flats in the second story for his family. Two of the flats on the third floor and immediately above the flat occupied by the plaintiff were occupied by the families of two women, Mrs. Ripple and Mrs. Bordner. The plaintiff moved into the building April 19, 1889, and the other tenants were moving in about the same time. The accident occurred that same evening. The whole building was equipped with gas pipes, but so arranged that each store and flat could be supplied with gas through a separate and independent meter.

Upon the application of the owner, made about the 29th of March, 1889, the company put in the service pipe extending into the cellar of the building through the cellar wall. The gas was excluded by means of the stopcock near the curb at the sidewalk. On the 10th of April one Steingriebe, who occupied one of the three flats on the third story, applied for a meter for his flat by signing an order book at the office of the company. Vinney & Krause, the tenants of the double store, had also and about the same time applied for a meter. The meters had in both cases been refused by the company until proper plans of the piping were furnished. These plans were subsequently furnished and the meters were then delivered. The gas was subsequently turned on by one of the gasfitters or his employee, and without notice to or knowledge on the part of the gas company. It had been the practice of the company for many years in Syracuse to accept and rely upon these plans when furnished the same as if they were a certificate by the gasfitter or plumber putting in the piping that such piping was then complete, tested and ready to receive gas, the company itself not making any examination. It did not itself connect the meters with the piping in a house nor itself and directly through its own agents and employees see to the turning on of the gas from the street mains through the

service pipe into the building. Those who applied for the meters engaged such persons as they chose to do this work. After the meters had been supplied to this building they were connected with the service pipe by the employees of the owner or tenants who engaged them for the purpose. There was customarily no objection made by defendant to the turning on of the gas from the street main after the person wishing to use the gas had applied for the same to defendant and been furnished by it with a meter. The defendant, by furnishing the meter, thereby consented to the turning on of the gas by any one. In this case the defendant relied on the certificate spoken of as to the condition of the pipes. In truth, the piping in the upper hallways had not been properly attended to before the gas was let into the building by one of the employees of the plumber or gasfitter who was engaged to attach the meter to the service pipe by one of the tenants. The ends of the pipes in the third story hallway had not been plugged, and hence the moment the gas was turned on in the street it went, in addition to the store where it was wanted, up through the other pipes into the hallway of the third story and escaped therefrom into that hall. The only opening at which the gas could escape was in the hallway. The hallway was also the only means of access which the tenants had to their respective flats from the street entrance. The two women tenants had not applied to the company to be furnished with gas and did not intend to use the same in their apartments. They were using oil for illuminating purposes. After the gas had been turned on from the street on the evening in question by some one not in any way connected with the company, and some time between half after eight and nine o'clock, the smell of gas became noticeable in the hallway mentioned. The plaintiff's son, a young man about 18 years of age, was in the apartment hired by his father, reading, when he heard the voices of the women, and going out into the second story hallway, asked them what was the matter. There was then no smell of gas in the plaintiff's apartment. The boy was told of the escaping gas somewhere and so he

went up stairs to the third story and said he would try and discover the location of the leak and stop it until morning and proposed to take a lamp. Mrs. Bordner, one of the tenants, said she thought a lamp would be dangerous, to which the boy assented and then said he would take a candle, as he had seen plumbers use a candle to find a leak. He, therefore, procured one and had it lighted and went to a pipe in the side wall in the third story and applied the flame to the cap of the pipe and around it and said "that is all right." Walking to the end of the hall he had partly got upon a barrel lying there, when an explosion occurred which injured the boy so that he soon thereafter died.

Gasfitters do in fact use torches and candles upon some occasions in testing or searching for leaks in gas pipes. Believing that the gas company had been guilty of negligence in causing the death of plaintiff's intestate under the circumstances herein stated, the plaintiff brought this action to recover damages on account thereof.

*Louis Marshall* for appellant. The court should have submitted to the jury the question as to whether the defendant was negligent in suffering gas to be turned into a new building which, as it was aware, was divided into different dwellings, occupied by different tenants, part of whom only desired to use such gas, without satisfying itself by an inspection of the premises, or otherwise, that its gas could be safely admitted into the building, or without adopting and insisting upon obedience to rules with respect thereto which would have properly regulated the introduction of gas under such circumstances. (3 R. S. [8th ed.] 2080, 2081, §§ 6, 7, 8; *Ferguson* v. *M. G. Co.*, 37 How. Pr. 189; *Regina* v. *White*, 20 Eng. L. & Eq. 585; *Queen* v. *First*, L. R. [1 Cr. Cas.] 172; Penal Code, § 651; *Van Leuven* v. *Lyke*, 1 N. Y. 515; *Hay* v. *C. Co.*, 2 N.Y. 159; *Marsh* v. *Hand*, 120 N. Y. 319; *Bohan* v. *P. J. G. Co.*, 122 N. Y. 18; *Ellis* v. *L. I. Co.*, L. R. [10 C. P.] 10; *Rylands* v. *Fletcher*, L. R. [3 Eng. & Ir. App.] 330; *Dixon* v. *Belle*, 5 M. & S. 198; *Thomas* v. *Winchester*, 6 N. Y. 397; *Crown-*

*hurst* v. *A. B. Board*, L. R. [4 Ex. Div.] 5 ; *Forth* v. *B. I. Co.*, L. R. [3 C. P. Div.] 254 ; *Henery* v. *Dennis*, 93 Ind. 452 ; Smith on Neg. 109 ; *Hipkins* v. *B. G. Co.*, 6 H. & N. 250 ; *Blenkiron* v. *G. C. G. Co.*, 2 F. & F. 440 ; *Mose* v. *H. G. Co.*, 4 F. & F. 324 ; *Burrows* v. *M. G. Co.*, L. R. [5 Ex.] 67 ; L. R. [7 Ex.] 46 ; 41 L. J. Ex. 46 ; *Lannan* v. *A. G. Co.*, 46 Barb. 264 ; 44 N. Y. 459 ; *Parry* v. *Smith*, L. R. [4 C. P. D.] 325 ; 48 L. J. [C. P.] 731 ; *Butcher* v. *P. G. Co.*, 12 R. I. 149 ; Pollock on Torts, 411, 413 ; *Chisholm* v. *A. G. Co.*, 57 Ga. 28 ; *Kinnaird* v. *S. O. Co.*, 41 Alb. L. J. 227 ; *Kennedy* v. *Ryall*, 67 N. Y. 379 ; *Abell* v. *D. & H. C. Co.*, 103 N. Y. 681 ; 128 N. Y. 662 ; *Sheehan* v. *N. Y. C. & H. R. R. R. Co.*, 91 N. Y. 332 ; *Berrigan* v. *N. Y., L. E. & W. R. R. Co.*, 131 N. Y. 582 ; *Warn* v. *N. Y. C. & H. R. R. R. Co.*, 80 Hun, 71 ; *Coppins* v. *N. Y. C. & H. R. R. R. Co.*, 122 N. Y. 557 ; *Whitaker* v. *D. & H. C. Co.*, 126 N. Y. 544.) Whether the deceased was, under all the circumstances, guilty of contributory negligence was a question for the jury. (*Kibele* v. *Philadelphia*, 105 Penn. St. 41 ; *Nichols* v. *B. & D. Co.*, 53 Hun, 137 ; 117 N. Y. 646 ; *Lee* v. *C. G. L. Co.*, 98 N. Y. 117 ; *Bartlett* v. *B. G. L. Co.*, 122 Mass. 209.)

*Edwin Nottingham* for respondent. The respondent discharged its full duty when it confined its gas to its own receptacles, and prevented its escape therefrom to the injury of others, at the same time allowing consumers to take the gas from its receptacles into their own as they had occasion to use it. (Laws of 1859, chap. 311, §§ 4, 5, 6, 8, 9 ; *Meirs* v. *M. G. L. Co.*, 14 Wkly. Dig. 552.) The implied permission of the gas company to gasfitters to turn on gas at the request of the consumer does not constitute negligence. (*Flint* v. *G. G. L. Co.*, 3 Allen, 343 ; 9 Allen, 552 ; 2 S. & R. on Neg. [4th ed.] § 697.) It has never been thought necessary by the legislature to regulate the use of gas by statute, as the use of poisons, gunpowder and other explosives, and even railroads, is regulated. (Penal Code, §§ 389,

402, 403, 404, 405 ; Laws 1850, chap. 140, §§ 40, 44; Laws 1854, chap. 282, §§ 7, 8 ; Laws 1879, chap. 415 ; Laws 1881, chap. 339 ; Laws 1844, chap. 439 ; Laws 1890, chap. 565, §§ 32, 33, 36, 49, 51.) The only question for determination is whether negligence can be predicated upon such facts ; and that was a question of law for the court, which has been correctly disposed of by the courts below. (*Lane* v. *Town of Hancock*, 142 N. Y. 510.) The intestate was guilty of negligence which contributed to his death, and it must be so held as a matter of law. (*Lanigan* v. *N. Y. G. L. Co.*, 71 N. Y. 29 ; *Cummins* v. *City of Syracuse*, 100 N. Y. 637 ; *Wendell* v. *N. Y. C. & H. R. R. R. Co.*, 91 N. Y. 421 ; *Hinz* v. *Starin*, 46 Hun, 527 ; *Powell* v. *N. Y. C. & H. R. R. R. Co.*, 109 N. Y. 613 ; *Young* v. *N. Y., L. E. & W. R. Co.*, 107 N. Y. 501 ; *Williams* v. *D., L. & W. R. Co.*, 116 N. Y. 629 ; *Splittorf* v. *State*, 108 N. Y. 206 ; *Donnelly* v. *B. C. R. R. Co.*, 109 N. Y. 17 ; *Smith* v. *N. Y. C. & H. R. R. R. Co.*, 38 Hun, 33 ; *Beck* v. *E. R. F. Co.*, 6 Robt. 83 ; *Davenport* v. *B. C. R. R. Co.*, 100 N. Y. 632 ; *Flood* v. *B., N. J. & P. R. Co.*, 23 Wkly. Dig. 501 ; *Motel* v. *S. A. R. Co.*, 2 How. Pr. [N. S.] 30 ; *Robertson* v. *Mayor, etc.*, 58 N. Y. S. R. 391 ; *Wiwirowski* v. *L. S. & M. S. R. Co.*, 124 N. Y. 420.)

PECKHAM, J. We think it was error to non-suit the plaintiff upon this proof. There was, in our judgment, a question for the jury to determine, the question being whether, upon all the evidence, the defendant company had been guilty of negligence which caused the death of the deceased youth.

A portion of the gas which escaped through the pipes in the third story hall found its way into the premises of the women tenants, and occasioned them annoyance from its odor. The deceased, upon hearing of the difficulty, and in order to aid the two women in its removal, endeavored to find the location of the leak for the purpose of stopping it with some temporary means until the next day. He was acting in their behalf and for their benefit, although the means he used were his own. The women were not consumers of the gas, and had made no

application to the company to be supplied with it, and its presence in the hall and in their apartments was most obnoxious to them, and if continued might, of course, soon have become very dangerous.

The question which should have been left to the jury was whether the company had failed to use such reasonable precautions as might properly be exacted of it before turning on the gas, or permitting it to be turned on by some third person.

The company in some respects occupied the position of a public corporation. It was by statute bound to furnish gas upon the written application of the owner or occupant of any building or premises within one hundred feet of any main laid down by it, subject to such just and proper regulations as it might adopt as a means of securing payment for its gas and safety in its supply. It manufactured and furnished an agent for illuminating purposes which might become a most dangerous one, liable to explode and to injure human beings and property. While this gas remained on the premises of the manufacturer, or while it was being conducted through its own pipes to different parts of the city, there can be no doubt that the company was bound to exercise vigilance to prevent injury to third parties from the dangerous qualities of the gas. The question is where its responsibility ended. The claim is made on its behalf here that such responsibility had certainly determined before this explosion occurred. It is urged that it had no responsibility for putting the piping in the house, as it was done by third parties under the employment of the owner; that it had no charge of such piping after it was fitted in the building; that the gas was turned on by third parties without consultation with or knowledge on the part of the officers of the company, which simply was accustomed to and in this case did permit any one to turn on the gas after plans had been submitted to it and a meter had been provided by it upon application.

These circumstances might furnish a good answer to the

company as against any claim of the owner of the building who had applied for a meter or any tenant who had so applied. The case of *Flint* v. *Gloucester Gas Light Co.* (3 Allen, 343) does not go far enough to save the defendant from any possible liability in this case. There the plaintiff was himself the owner of the building and had employed and paid one Thomas to put gas pipes therein connected with the service pipe laid by the defendant and to put up and arrange the fixtures and burners necessary for using gas in some of the rooms. This man, having put the fixtures in the building, himself turned on the gas, and the explosion soon thereafter took place. The plaintiff claimed that Thomas in turning on the gas was the agent of the defendant, while the defendant claimed that it had simply been cognizant of a custom on the part of Thomas or other gasfitters to turn on the gas when they had completed their piping, and that defendant had simply permitted it, but had in no sense employed Thomas or any one else to do it. The defendant requested the court to charge that this mere permission was not sufficient to make Thomas its agent if it had never assumed to furnish or interfere with the pipes or fixtures inside the building. The court declined to give such instruction, and it was held error. It was a case of an application for gas by the owner of the building. We are here not dealing with the case of an owner or of a tenant who had made application for a meter and who might be said to have asserted by that act the proper condition of the piping and to have thereby waived any further examination. Here is the case of an injury to a third person arising from an explosion in the third story hall caused by the escape of the gas from pipes situated in that story and not properly capped, by reason of which the escaping gas penetrated into the apartments of non-consumers and who had made no application for such gas.

Was there any negligent failure on the part of the defendant company to do what was reasonably prudent for the purpose of insuring safety to those women and to those who were roused by them to make efforts to discover the source of

the leak ? The company surely had no right to intentionally pour out its manufactured gas upon the tenants who had not applied for it. Some care was due from it when supplying those who did apply, to see that those who did not should be protected from the undesired element.

The defendant urges that it would be most unreasonable to impose upon it the duty of knowing when gas was to be turned on in every building in the city where it was to be used and to inspect the piping immediately prior to the turning on of the gas. It is asserted such a duty would be almost impossible of performance and that every reasonable requirement is met by the obligation to inspect upon notice and request. But the company by the adoption of the custom already spoken of in regard to the delivery of the plans of the piping to it entirely did away with the necessity of notifying it and left it to the discretion of the owner or applicant at what time or by whom the gas might be turned on. It has by its own act relieved itself, so far as it could, of any obligation to make inspection before the gas shall be turned on. We do not see the impracticability of inspection as is alleged by defendant or its great expense. If when a meter should be applied for in an apartment house like this in order to take the defendant's gas, the defendant should at the time of sending it send a proper inspector to inspect the piping, there would not be much difficulty in that case. The inspection here spoken of would not include the examination of pipes under floors or covered by plastering ; no ripping up of work already done in the way of flooring and of lath and plastering could reasonably be required. A fair examination of the piping which was disclosed and the ends of tubes coming out into the open spaces through which the gas might penetrate into other quarters than where it was applied for, would certainly be all that could ever be reasonably called for. We do not say that even this must be done as a legal proposition. It is a question for the jury upon the issue of negligence.

The suggestion that the company had no right to enter upon the premises for that purpose we do not regard as well

founded. It might properly refuse to permit the gas to be turned on in a case of separate stores and flats like that here presented, until some reasonable examination of the piping had been made in the other portions of the building, where gas had not been applied for, such as would lead to the belief that the piping in that other portion was in proper condition. We do not say that the company was bound, as matter of law, to make this examination by its own agents, or that a failure to make it, and a reliance on the certificate implied from the delivery of plans was negligence, but we say that whether such reliance was or was not negligent was, under the circumstances of this case, a matter for the jury to decide. Having adopted the practice of relying upon the plans when delivered as equivalent to a certificate that the piping was in good condition, and thereafter permitting any one to turn on the gas, the propriety of that custom must go to the jury upon the question of negligence.

The defendant, after the delivery of the plans and having thus obtained a general knowledge of the character of the building, must have known of the separate stores and apartments, and that separate meters were required. The agents of the defendant saw that by the plans the pipes were placed so as to distribute the gas to other portions of the building than those from which application had been so far made. Was it or not a reasonable matter to ask of the defendant that before permitting its gas to be turned into the building for the purpose of supplying those who had applied for it, the company should, through its own servants, make some examination of the state of the piping leading to the other quarters, to the end that it might say with reasonable certainty such piping was in proper condition to hold the gas, and not to let it escape upon the premises of those who had not applied for and did not want it? Or had the company done all that could reasonably have been required of it by entering into the understanding as to the plans, and that their delivery should be regarded as equivalent to a certificate? This presents, we think, a fair question of fact and not one of law.

The defendant also urges that it was not its duty to turn on the gas, but it was only obliged to allow it to be turned on, and, therefore, it ought not to be held liable for the act of a stranger. In this we think it entirely misapprehends its duty. It is obliged to supply the gas to applicants. When they have done what is necessary to make a connection with its consent with the mains of the defendant and have applied for and obtained the meter to measure their supply, we are clearly of the opinion that in order to fulfill its duty to supply gas the defendant is under the obligation when applied to of turning it on so that the supply may be given. Certainly it ought not to be held liable for the act of a stranger in turning on the gas without its knowledge or request. We do not permit any liability to be founded upon that fact. If liable at all, it must be for its own neglect (if the jury shall so find) in failing to make any inspection and in adopting a custom which when carried out permitted the turning on of the gas by any one at any time after the delivery of a meter by the company. This is the extent of defendant's liability. We do not think the principle of the case of *Rylands* v. *Fletcher* (L. R., 3 Eng. & Ir. App. 330) applies here. The defendant is not an insurer. In the English case the defendant was held liable at all events for the damage done to his neighbors' mines by reason of an overflow from water which the defendant had accumulated on his own land.

Here the defendant is engaged in manufacturing and selling an article which has become so universally used for illuminating purposes as to be regarded almost as an essential of city life. Having manufactured it, the law compels the company to furnish it to an owner or occupant on certain terms. It is bound not only in the fulfillment of the purpose of its existence but by affirmative provisions of law to deliver the gas into the buildings of others. In making that delivery it is not an insurer, but is simply bound (in such a case as this) to that degree of care which the nature of the article it deals in and the consequences to be apprehended from an accident reasonably call for. Nor do we assume to say that when once

the piping in cases similar to this has been fairly and properly examined previous to turning on the gas (if such examination by defendant's servants is called for at all), that thereafter there is a continuing liability on the part of the company to see to it that such piping is kept in proper condition. As the company has no control over the piping, does not put it in and is not consulted about it, the principle upon which it might be held liable in cases of this character at the time of the first delivery of gas, if no precaution were taken at all, is simply that it would have the right to refuse to turn on, or permit others to turn on, the gas for the supply of the applicants until properly assured of the condition of the piping in other portions of the building. Having become assured of it, and the gas being on, it would not seem that the company ought further to be regarded as liable for the continuous good condition of the piping. Here we may justly say that to impose such a liability upon the defendant would clearly be unreasonable. It would render necessary the examination at frequent intervals of all the buildings in the city in which gas was used. This would be so onerous as to be practically impossible of execution because of the expense to the company. The law ought not to, and does not, exact an unreasonable amount of care from any one. Under the restrictions, however, as above stated, we think the question of defendant's negligence was for the jury.

The other ground of defense, as to the contributory negligence of the plaintiff's intestate, we do not think should be taken from the jury. Sometimes it is extremely dangerous to take a light to discover the location of a gas leak and sometimes it is not, depending upon various circumstances, among others, upon the extent of the leak, the size of the inclosure where located and the length of time the leak has existed. The plaintiff's intestate, a boy of eighteen, took the candle with the statement that he had seen gas men take a candle to find a leak, and it is a fact that they do so upon some occasions. The whole case as to the contributory negligence of the plaintiff's intestate should be submitted to the proper judges of fact.

The judgment must be reversed and a new trial granted, costs to abide the event.

O'BRIEN, BARTLETT and HAIGHT, JJ., concur; FINCH and GRAY, JJ., dissent; ANDREWS, Ch. J., not sitting.

Judgment reversed.