**Raymond BUDDING, Appellant,**

v.

**GARLAND FLOOR COMPANY, INC., and Park–Mark, Inc., Respondents.**

No. 68546.

Missouri Court of Appeals,
Eastern District,
Division Four.

Dec. 10, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 5, 1997.

Application to Transfer Denied
March 25, 1997.

and a judgment entered on a jury verdict in favor of Garland and Park–Mark, Inc., on a negligence claim.

On appeal, appellant contends that the trial court erred in: 1) granting Garland's motion for JNOV because Garland had a legal duty to warn him of the dangerous effects of its product; 2) excluding the testimony of Ralph Hemphill because his testimony was relevant to show notice on the part of Garland and to rebut Garland's evidence of the non-toxic nature of the product; and 3) *sua sponte* granting Garland a new trial because Garland only filed a motion for JNOV. We affirm.

Since a motion for JNOV presents the issue of whether appellant made a submissible case, we review the evidence in the light most favorable to his case and accord him all reasonable inferences which can be drawn from the evidence. *London v. Weitzman,* 884 S.W.2d 674, 675[1] (Mo.App.1994). Our review is not, however, limited to isolated facts, but includes all of the evidence adduced in appellant's behalf. *State ex rel. Missouri Highway and Transp. Com'n v. Keeley,* 780 S.W.2d 84, 87[1,2] (Mo.App.1989). Moreover, we need not disregard all evidence unfavorable to appellant; we must disregard only Garland's evidence unfavorable to appellant. *Id.* In addition, we will affirm the judgment of the trial court if the decision is supported by any one of the grounds set forth in the JNOV motion. *CIT Group/ Equip. v. Integrated Fin. Serv.,* 910 S.W.2d 722, 729[4,5] (Mo.App.1995). Viewed in this context, the facts are as follows.

Jeffrey J. Lowe, Joan M. Lockwood, Gray & Ritter, P.C., St. Louis, for Appellants.

Russell F. Watters, William T. Kacerovskis, Brown & James, P.C., Colleen C. Jones, Hayes, Newmark & Steigerwald, St. Louis, for Respondents.

SIMON, Judge.

Appellant, Raymond Budding, appeals the granting of a motion for judgment notwithstanding the verdict (JNOV) in favor of Garland Floor Company, Inc. (Garland), in a products liability action for failure to warn,

Garland is in the business of manufacturing and installing industrial floor coating products which contain epoxies and polyurethanes. Anheuser–Busch, Inc. (A–B) contracted with Garland to supply floor coating products and to refinish 19,500 square feet of floors on the second floor of the Beer Packaging and Receiving (Bevo) building over the weekend of December 30, 1989, through January 1, 1990. A total of 832 gallons of floor coating material manufactured by Garland was applied. Garland subcontracted with Park–Mark, Inc. to do 7,600 square feet of floor coating work in the Material Receiving

Building (MRB). A total of 78 gallons of the floor coating material manufactured by Garland was used in the MRB. All of the floor coating work for Bevo and the MRB was completed by January 1, 1990.

Appellant has been employed by A–B since July 9, 1974, as a beer bottler. He worked as a unit serviceman on the fifth floor of the Bevo building. His job was to supply material to unit # 66, and said supplies were kept on the third floor of the MRB. A bridge connects the fifth floor of the Bevo building to the third floor of the MRB.

On January 2, 1990, appellant arrived at work a little after 7:00 a.m., and when he arrived on the fifth floor of the Bevo building he smelled a chemical odor. Appellant then drove a fork lift towards the MRB when he noticed the fumes were stronger than the first time he smelled them. At this time, the exhaust fans on the west side of the Bevo building were not operating and/or functioning. Further, the two supply fans closest to Unit # 66 were not working. When he got back to his unit after going to the MRB, the fumes began to irritate his nose and throat.

At about 2:15 p.m., appellant went to the dispensary where he reported that his nose was bothering him, he had a hard time breathing, he was coughing, and that he smelled fumes on the fifth floor of the Bevo building. He also reported having muscle problems. The next morning, appellant saw the company doctor and x-rays revealed that he had fluid in the fissures of his lungs. He was diagnosed as having possible pneumonitis, a chemically induced asthma. Appellant's symptoms persisted through the month of January, 1990. On February 9, 1990, it was determined that appellant had hyperactive airways. On March 2, 1990, appellant was diagnosed as having a complex polyneuritis, motor and sensory, and that his problem was caused by chemical exposure at work.

Due to his symptoms, appellant did not work from February 9, 1990 through December 22, 1991. By February, 1992, appellant again stopped working due to muscle problems. In March, 1992, appellant was prescribed Amitriptyline, a drug commonly prescribed for patients with nerve injuries.

Appellant was able to return to work in July, 1992, and has worked ever since. However, whenever appellant stops taking Amitriptyline, his muscle problems return.

On July 8, 1994, appellant and his wife Denise (wife) filed a second amended petition containing three counts against Garland, Park–Mark, and Guarantee Electrical Company (Guarantee Electric), which allegedly installs and maintains the exhaust fans in the Bevo building. In Count I (negligence) appellant alleged that Garland, Park–Mark, and Guarantee Electric were negligent in: 1) failing to warn him of the potentially harmful fumes; 2) failing to ensure adequate ventilation existed in Bevo and the MRB; 3) failing to test the ventilation system prior to applying the floor coating; and 4) failing to turn on the ventilation system after the floor coating was applied. As a result of said negligence, appellant was injured.

In Count II (product liability—failure to warn) appellant alleged that Garland failed to give A–B and its employees adequate warning of the unreasonably dangerous chemicals used in the floor coating. Further, as a direct result of the defective floor coating, appellant was injured. In Count III (loss of consortium), wife alleged that as a result of Garland's, Park–Mark's, and Guarantee Electric's negligence, appellant has been injured and she has lost the care, comfort, society, companionship, and consortium of appellant.

Responding, Garland, Park–Mark, and Guarantee Electric filed answers essentially denying the substantive allegations of appellant's second amended petition. Furthermore, Garland filed a cross-claim against Park–Mark and Guarantee Electric seeking contribution and indemnity in the event Garland is held liable for appellant's injuries. On March 6, 1995, appellant and wife dismissed without prejudice their action against Guarantee Electric. On March 20, 1995, wife dismissed Count III without prejudice against Garland and Park-Mark.

At trial, appellant presented the testimony of Bob Johnson (Johnson), the maintenance planner for A–B. He testified that in January 1990, he was responsible for all of A–B's Beer Packaging and Shipping facilities, in-

cluding the Bevo building and the MRB. He testified that prior to Garland beginning the work, a representative of Garland, Jeff Faulkner (Faulkner), came to meet him on the work site. Johnson told Faulkner that Garland was not to use A–B materials, tools, or equipment when doing the work. In addition, Johnson testified that Faulkner provided him with material safety and data sheets (MSDS) for the products they were going to use in coating the floor. Johnson, in turn, gave these MSDSs to Glen Cunningham, who was in charge of safety. He testified that Garland did not notify him of any precautions which needed to be taken when the workers came back from the holiday weekend.

The MSDSs were introduced into evidence by appellant. Specifically, the MSDSs contained information regarding the floor coatings. The MSDSs contained information and warnings as to: 1) volatility of the floor coating chemicals and extinguishing media; 2) reactivity data; 3) the health hazards if the coating comes in contact with eyes, skin, etc., including respiratory irritation; 4) what adequate ventilation should be used; 5) the use of general mechanical ventilation and local exhaust; and 6) the potential effects of exposure and the emergency and first aid procedures to be employed in the event of inhalation.

Appellant also presented the testimony of Carl Kramer (Kramer), appellant's foreman's boss. He testified that MSDS sheets provided by an outside contractor, such as Garland, would have to go through A–B's safety department and maintenance department before work began. He also testified that he had no knowledge of the flooring work which was being done, and he was not given any instructions or precautions that should be taken when he came back to work on January 2, 1990.

Counts I and II were submitted to the jury, and on Count II, the following verdict director, which essentially tracks MAI 25.09 (1995) (Products Liability—Negligent Manufacture, Design, or Failure to Warn), was submitted:

> Your verdict must be for [appellant] on his claim for failure to warn against [Garland] if you believe:

> First, the floor coating was defective in that when applied it gave off fumes, and

> Second, [Garland] failed to use ordinary care to adequately warn of the risk of harm from the dangerous fumes given off by the floor coating when it was applied, and

> Third, as a direct result of such failure, [appellant] sustained damage.

The jury returned verdicts in favor of Garland and Park–Mark on Count I, and on Count II, a verdict in favor of appellant against Garland in the amount of $194,250.00. Garland filed a motion for JNOV directed to the jury's verdict on Count II. The motion contended that the verdict should be set aside because: a) appellant failed to present substantial evidence that Garland knew the floor product was harmful; b) Garland had no legal duty to provide any warning directly to appellant; c) appellant failed to present substantial evidence to establish that Garland's warnings were inadequate; d) appellant failed to present substantial evidence to prove A–B would have altered its conduct had Garland provided additional warnings; e) appellant failed to present substantial evidence to prove his injuries were caused by Garland's chemicals; and f) the jury's verdict in favor of Garland on Count I established that appellant failed to prove that Garland's warnings were inadequate or that any such inadequacy caused his damages.

On June 6, 1995, the trial court granted Garland's motion for JNOV. The trial court's order also provided that if the JNOV is either vacated or reversed, Garland would be granted a new trial on the grounds that the jury's verdict was against the weight of the evidence.

In his first point on appeal, appellant contends that the trial court erred in granting Garland's motion for JNOV because Garland had a legal duty to warn him and inadequately did so. Further, that appellant presented ample, competent evidence such that a reasonable mind could conclude that Garland's negligence was the proximate cause of his damages. Appellant relies on *Griggs v. Firestone*, 513 F.2d 851 (8th Cir.1975), to support his contention that Garland had a duty to

warn appellant directly of the dangerous properties of the floor coating. Appellant contends that under *Griggs*, § 388 Restatement (Second) of Torts contemplates a variable duty to warn, dependent on the nature and degree of danger. Section 388 Restatement (Second) of Torts provides:

§ 388. Chattel Known to be Dangerous for Intended Use

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

In *Griggs*, an owner of a truck removed the tires and rims from the truck and replaced them with different tires and mismatched rim components. The owner then traded the truck to Presson Ford Sales, who in turn sold it to plaintiff's employer. Shortly after the purchase one of the tires went flat and plaintiff attempted to repair it. During the repair, the tire blew off the truck and plaintiff was injured. Plaintiff filed suit against the manufacturer of the tire rim alleging that it was negligent in failing to stamp a warning on the rim component advising users that mismatching rim components could be dangerous, relying on § 388 Restatement (Second) of Torts. The manufacturer contended that it adequately warned of this danger by distributing catalogues containing the proper safety information. Plaintiff contended that this literature did not trickle-down to the various local service stations which dealt with truck rims and repaired truck tires.

In applying § 388, the court concluded that entrusting conveyance of a warning to a middleman in the chain of distribution would be unreasonable if the danger posed by the chattel is great. *Id.* at 858[6]. Therefore, where it is practicable and not unduly burdensome, a chattel should be made to carry its own warning. *Id.* The court held that plaintiff made a submissible case because jurors could reasonably find that warnings against using mismatched tire rim components should have been permanently stamped on the rim components themselves. *Id.* at 859[7].

However, we find *Griggs* factually and legally distinguishable. *Griggs* concerned the supplying of a chattel to a third person for another to use, and § 388 is specifically applicable to situations where a person who in any way or for any purpose supply chattels for the use of others or to permit others to use their chattel. Missouri has long recognized that a manufacturer has a duty to warn ultimate users when the product is inherently dangerous. *Morris v. Shell Oil*, 467 S.W.2d 39, 42 (Mo.1971). Here, as stated in Count II, the evidence indicated that Garland manufactured and installed the floor coating materials itself. Thus, the factual situation envisioned by § 388 is not present.

Here, the facts are more comparable to those in *Hunt v. Laclede Gas Company*, 406 S.W.2d 33 (Mo.1966). In *Hunt*, plaintiff was an employee of an independent contractor hired by the State Highway Commission to widen a street. Other employees of the contractor damaged a gas pipe line causing a leak. The contractor's supervisory employees were present when the break occurred and notified Laclede Gas Company. A member of Laclede's crew cautioned plaintiff's superior that he better get his men out of the vicinity. Plaintiff received no warning and was subsequently injured by the gas line explosion. Plaintiff contended that the owner of the gas line, Laclede, was negligent for failing to warn him personally to leave the area once it was discovered a gas leak existed at the work site.

In upholding the trial court's granting of a directed verdict in favor of Laclede, our Supreme Court held that:

Warning to the superiors in employment of a person is warning to that person, the employment relation permitting a reasonable assumption that such notice will be communicated in the ordinary course to all employees on the work. This rule is based upon the principle that an employer has an affirmative duty to warn and instruct his employees concerning the dangers of their work.

* * *

To require [Laclede] to bring notice home to every employee ... who might possibly be involved on the job would impose a standard of duty exceeding reasonable bounds[.]

*Hunt,* 406 S.W.2d at 38[4].

▪ Here, it is undisputed that Garland delivered the MSDSs to Johnson, the maintenance planner responsible for the Bevo building and the MRB. Johnson then delivered the MSDSs to Cunningham, A–B's person in charge of safety. Although the floor coatings are not part of appellant's work they are, at this particular time, a part of his work environment. The MSDSs provided information and warning as to: a) volatility of the floor coating chemicals and extinguishing media; b) reactivity data; c) the health hazards if the coating comes in contact with eyes, skin, etc., including respiratory irritation; d) what adequate ventilation should be used; e) the use of general mechanical ventilation and local exhaust; and f) the potential effects of exposure and the emergency and first aid procedures to be employed in the event of inhalation. Furthermore, Kramer testified that the MSDSs would have to go through the safety and maintenance departments before work began. As a result, appellant's employer, through its department heads and supervisors, had ample warning of the potentially dangerous effects of the floor coating chemicals, and Garland may reasonably assume that the warnings would be communicated to appellant and his fellow employees. *See Hunt, supra.* To require Garland to personally notify appellant of the potential hazards would be unreasonable. *See Hunt, supra.* Therefore, by supplying the MSDSs to appellant's employer, Garland exercised

ordinary care to adequately warn of the risk of harm from the floor coating.

▪ In his second point on appeal, directed to his negligence claim, appellant contends that the trial court erroneously excluded the testimony of Ralph Hemphill, because his testimony was relevant to show notice on the part of Garland and to rebut defendant's evidence of the non-toxic nature of its product.

Hemphill's testimony, as reflected in his deposition, would have shown that several months before this occurrence, he was working in Bevo, while Garland was applying its floor coating in the MRB. Fumes came from the MRB into Bevo and caused him to have difficulty breathing and burned his throat and eyes. Later that evening he went to the emergency room and was diagnosed as having something similar to chemically induced pneumonia.

▪ The degree of similarity required for evidence that constitutes notice to defendant of prior similar occurrences is less demanding than the similarity required for evidence offered to show that the same occurrence occurred on the occasion at issue. *Stacy v. Truman Medical Center,* 836 S.W.2d 911, 926[28] (Mo.banc 1992). Appellant argues that under this lesser standard Hemphill's testimony should not have been excluded. While it is not required that the prior occurrence be identical to the one in which the plaintiff was injured, the similarity of the two occurrences is a factor to be considered by the trial court when such evidence is offered. *Fletcher v. City of Kansas City,* 812 S.W.2d 562, 564[4] (Mo.App. 1991).

Here, the factual situation is different. While appellant may have suffered similar symptoms as Hemphill, the coating application process began some 71 hours before appellant arrived at work and was completed 17 hours before his arrival. There is a substantial time difference in which appellant and Hemphill would have been exposed to the fumes. Hemphill was present when the coating was being applied, while appellant did not arrive until at least 17 hours after the coating process was completed.

The trial court has wide discretion on issues of admission of evidence of similar occurrences and our review is limited to whether the trial court determined that the evidence is relevant and that it bore sufficient resemblance to the injury causing incident, while weighing the possibility of undue prejudice and confusion of issues. *Richardson v. State Highway & Transp. Com'n.*, 863 S.W.2d 876, 881[14,15,16] (Mo.banc 1993). Judicial discretion is abused if the trial court's ruling is clearly against the logic of circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.* If reasonable minds could differ about the action taken by the trial court, then the trial court did not abuse its discretion. *Id.* Because of the difference in the two incidents, as noted, we find that the trial court did not abuse its discretion.

Appellant contends that Hemphill's testimony was relevant to rebut defendant's evidence that their employees were not affected by the chemical when applied and its exclusion was erroneous and prejudicial. Hemphill would have testified that large air movers were used to push the chemical fumes back through the tunnel and into the MRB. He would have further testified that he suffered ill effects from his exposure to the fumes. Appellant contends that plaintiff may offer evidence to contradict defendant's evidence by supplying additional evidence to test the accuracy of a witness' testimony, relying on *D.K.L. by K.L. v. H.P.M.*, 763 S.W.2d 212, 219[3,4] (Mo.App.1988) in support of that proposition.

Either party is entitled to introduce evidence to rebut that of his adversary, and for this purpose any competent evidence to explain, repel, counteract, or disprove the adversary's proof is admissible. *Id.* "Impeachment" is directed to the credibility of a witness for the purpose of discrediting the witness and ordinarily furnishes no factual evidence, whereas "contradiction" is directed to the accuracy of a witness' testimony and supplies additional evidence. *Id.*

Here, Hemphill's testimony does not impeach nor question the accuracy of defendant's evidence that its workers applied the chemical without the aid of respirators or masks and that they suffered no ill effects from the chemical fumes.

The admissibility of rebuttal evidence is within the trial court's discretion. *Nash v. Stanley Magic Door, Inc.* 863 S.W.2d 677, 682[10] (Mo.App.1993). We find no abuse of discretion. Point denied.

As a result of our disposition of appellant's first and second points, we need not address appellant's remaining point on appeal.

JUDGMENT AFFIRMED.

PUDLOWSKI, P.J., and HOFF, J., concur.