Nathan GOVREAU, Plaintiff/Appellant,

v.

NU–WAY CONCRETE FORMS, INC., Defendant/Respondent,

The Terramite Corporation, Defendant,

and

The Protectoseal Company, Defendant.

No. ED 78966.

Missouri Court of Appeals, Eastern District, Division One.

Feb. 19, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 8, 2002.

Application for Transfer Denied May 28, 2002.

David G. Ott, Christine M. Kocot, Jeffery T. McPherson, Armstrong Teasdale LLP, St. Louis, MO, for appellant.

James A. Gottschalk, Law Office of Donald B. Balfour, Sunset Hills, MO, for respondent.

KATHIANNE KNAUP CRANE,
Judge.

Plaintiff was seriously burned when gasoline shot out of the tractor he had been operating and ignited. At the time of the accident the gas cap had been modified from its original condition in that a solid screw had replaced the original vented screw. Plaintiff brought a lawsuit against the seller of the tractor[1] to recover damages. Plaintiff's theory at trial was that the screw had been replaced before it left the seller. The case was submitted to the jury under theories of strict products liability and negligence. The jury returned a verdict in seller's favor.

On appeal, plaintiff contends that the trial court erred in refusing to allow plaintiff's employer's principal to testify that, on the day the tractor was purchased, he was on seller's premises and observed gasoline spilling out of the gas cap of another tractor and a salesperson indicated that it must "have a faulty gas cap or something." Plaintiff argues that the evidence was relevant to show defendant's knowledge of the modification of the gas cap on the T5 tractor and negligence and to impeach the testimony of defendant's witnesses that they had not received any complaints relating to gas caps. We affirm.

Defendant, Nu–Way Concrete Forms, Inc. (Nu–Way), is a construction supply firm that rents and sells equipment. In March, 1994 Nu–Way purchased a new T5C compact tractor backhoe, serial number 540211, (hereinafter "the T5 tractor") from Terramite Corporation. Nu–Way rented the T5 tractor to other customers before it sold it to plaintiff's employer Cadco, Inc. d/b/a Ozark Transport (Ozark Transport), on October 9, 1995. Nu–Way serviced the T5 tractor while it rented it out. Nu–Way's service records on the T5 tractor did not show any maintenance done or repairs made to the gas cap or record any complaints about the gas cap or engine

---

1. He also brought claims against the manufacturer of the tractor and the manufacturer and seller of the gas cap which were subsequently dismissed with prejudice by stipulation.

problems caused by the gas cap while it was a rental unit. Nu–Way's service manager operated Nu–Way's Terramite rental units and always locked the gas cap and had no engine problems.

Cort Dietz handled the purchase of the T5 tractor for Ozark Transport. It had 553 hours of use when purchased and came with a 90–day warranty. Plaintiff was an employee of Ozark Transport. Plaintiff and another employee, Mark Coleman, picked up the T5 tractor from Nu–Way on October 10, 1995.

Mr. Dietz operated the T5 tractor on various occasions between October 10, 1995 and June 29, 1996. Mr. Dietz always operated the T5 tractor with the gas cap latched and did not have any problems with the engine dying, sputtering, or hesitating. Several other employees, including plaintiff, operated the T5 tractor during this time. Mr. Dietz did not recall that any employee reported any problems with the tractor's engine, including specific problems such as starting, dying, hesitating, sputtering, or stalling. He did not recall that any employee reported any problems with the gas cap or gas tank leaking. Mr. Dietz did not recall that any employee ever told him that he operated the T5 tractor with the gas cap unlatched. No employee ever complained that the engine died.

Plaintiff was in charge of the T5 tractor after it was purchased. He performed the maintenance work on it and operated it several times every month. He always filled the seven-gallon fuel tank with a five-gallon gas can. The manual required that 1½ to 2 inches be left in the tank for fuel expansion.

On June 29, 1996, the day of the injury, plaintiff filled the T5 tractor's gas tank at a service station with a nozzle from a pump for the first time. Plaintiff filled the tank to the point where the nozzle "clicked" off; he could not tell whether he left room for 1½ to 2 inches in the gas tank for fuel expansion. He did testify that he filled the T5 tractor with more gas than normal on the date of the accident. Plaintiff took the T5 tractor by trailer to the work site. After unloading the T5 tractor at the work site, he unlocked the gas cap and observed gas sloshing out of the gas cap and onto the hood as he drove the tractor across a gravel parking lot. Plaintiff moved rock for several minutes with the gas cap unlatched and again noticed gas coming out of the gas tank.

Plaintiff thought that he had over-filled the gas tank, so he "locked down" the gas tank and let the engine run, in order to use some of the excess fuel. Plaintiff then drove the T5 tractor to the bottom of a hill and let it sit in the sun in ninety-degree heat for two or three hours with the gas cap latched while he ate his lunch and did some paperwork. After lunch, plaintiff began operating the T5 tractor again. The engine died and plaintiff unlatched the gas cap. Gas shot out of the tank and up into the air one or two feet and sprayed fuel on plaintiff's lap, legs and hands. When plaintiff reached down to turn the key to the off position, the gas ignited and severely burned plaintiff.

When the T5 tractor was manufactured, it had a vented screw in the gas cap. After the accident, inspections of the gas cap revealed that the vent screw had been removed and replaced with an ordinary, solid screw.

Plaintiff thereafter filed this action. Plaintiff's theory was that the accident was caused because the gas cap had a solid screw, and that the solid screw had been in the gas cap when it left the seller. Plaintiff's theory was based on expert testimony that, when the unvented cap was latched, the gas heated up and expanded and, be-

cause there was no air layer left in the tank into which the gas could expand, the gas shot out when plaintiff flipped the lid open. To show that the gas cap had left the seller with the unvented screw, plaintiff relied on his and another employee's testimony that on the day they picked up the T5 tractor an unidentified person at Nu–Way had told them to operate the tractor with the gas cap unlatched and that they, in fact, did so because otherwise the engine would die.

Prior to trial Nu–Way filed a motion in limine, which among other relief, sought to exclude Mr. Dietz from testifying that, at the time of purchase, he saw gas spill out of the gas tank of another Terramite tractor on Nu–Way's premises and heard one of Nu–Way's employees attribute the gas spillage to a faulty gas cap. The trial court granted the motion with respect to this relief and, after briefing and argument, denied plaintiff's motion for reconsideration. During Mr. Dietz's trial testimony, plaintiff advised the court that it was submitting pages 37 through 40 of Mr. Dietz's deposition as its offer of proof. Counsel mentioned that they had "been through this in motions and the court's heard it, and if it'll suffice," he would file the deposition pages with the court reporter and go on to something else. Defense counsel and the court agreed.[2]

After the completion of Nu–Way's evidence, plaintiff's counsel again sought to have Mr. Dietz's excluded testimony admitted to rebut testimony of defense witnesses that they did not have any problems with gas caps on Terramite tractors and had received no complaints about gas cap problems. The court denied this request and said its prior ruling would stand.

The case was submitted to the jury on theories of strict products liability and negligence. The dangerous condition was submitted as a gas cap ventilation system which used a solid set screw in place of a hollow or vented screw.

In his only point on appeal, plaintiff claims that the trial court erred in not allowing Mr. Dietz to testify that, prior to purchasing the T5 tractor, he saw gasoline spilling out of another Terramite tractor on Nu–Way's premises and that one of Nu–Way's employees "said something to the effect of it has—it must be a faulty gas cap or something and they will fix that." Plaintiff argues that this testimony was relevant to show Nu–Way's knowledge that gas caps were defective and to impeach Nu–Way's witnesses who had testified that they had received no complaints about gas caps.

A. *Knowledge*

 Evidence of other accidents may be relevant "(1) to prove the existence of a

**2.** Nu–Way contends that this offer did not preserve the question for review. We disagree. It is clear from the pretrial proceedings and this colloquy that the trial court and opposing counsel clearly understood what testimony was being offered and plaintiff's arguments in support of its relevancy and admissibility. *Brown v. Hamid,* 856 S.W.2d 51, 55 (Mo. banc 1993). Nu–Way also complains that the proffered testimony, which is in the appendix, does not appear in or attached to the transcript. Rule 84.04(f) allows copies of exhibits on the record to be included in the appendix if the original exhibits and excerpted portions of the record are properly filed and made a part of the record on appeal in accordance with Rule 81. The record on appeal does not contain as a separate exhibit the pages that were to be filed with the court reporter. However, we have been directed to a motion in the legal file which has pages 37–40 of Mr. Dietz's deposition attached thereto and there appears to be no dispute that these duplicate the pages referenced in the offer of proof. As so clarified, the record is sufficient for us to understand on appeal what testimony was being offered.

particular physical condition or defect, (2) to show that the defect or dangerous situation caused the injury, (3) to show the risk that defendant's conduct created, and (4) to prove that defendant had notice of the danger." *Benoit v. Missouri Highway and Transp.*, 33 S.W.3d 663, 670 n. 3 (Mo. App.2000) (citing CHARLES MCCORMICK, ON EVIDENCE, § 200 at 703–07 (John Strong ed., 5th ed.1999)). "A trial court may admit evidence of prior accidents if the evidence is of an accident of like character that occurred under substantially the same circumstances and resulted from the same cause." *Lopez v. Three Rivers Elec. Coop. Inc.*, 26 S.W.3d 151, 159 (Mo. banc 2000)(citing *Hess v. Chicago, Rock Island and Pac. RR*, 479 S.W.2d 425, 431 (Mo. 1972)).

However, the degree of similarity required for evidence that constitutes notice to defendant of prior similar accidents is less demanding than the similarity required to show that the same accident occurred on the occasion in issue. *Stacy v. Truman Medical Center*, 836 S.W.2d 911, 926 (Mo. banc 1992). *See also Emery v. Wal–Mart Stores, Inc.*, 976 S.W.2d 439, 446 (Mo. banc 1998). "When evidence of other accidents is introduced to show notice of danger, the similarity in the circumstances of the accidents need not be completely symmetrical." *Pierce v. Platte–Clay Elec. Co-op., Inc.*, 769 S.W.2d 769, 774 (Mo. banc 1989). When the theory of recovery is negligence, any knowledge or warning that defendant had of the type of accident in which plaintiff was injured clearly aids the jury in determining whether a reasonably careful defendant would have taken further precautions under all the facts and circumstances, which include the knowledge of defendant or prior accidents. *Stacy*, 836 S.W.2d at 926.

Although *Stacy* holds that less similarity is required of prior accidents to show knowledge of danger than to show an identical accident, it is required "that the previous injury or injuries be such as to call defendant's attention to the dangerous condition that resulted in the litigated accident." *Id.* at 926 (quoting CHARLES MCCORMICK, MCCORMICK ON EVIDENCE, § 200 at 708 (John Strong ed., 4th ed.1992)). Thus, while the prior occurrence need not be identical to the one in which the plaintiff was injured, the similarity of the two occurrences is a factor the trial court should consider when such evidence is offered. *Budding v. Garland Floor Co., Inc.*, 939 S.W.2d 419, 425 (Mo. App.1996). We give the trial court wide latitude in determining whether such evidence is relevant and whether the circumstances bear sufficient resemblance to those that caused the injury at issue. *Emery*, 976 S.W.2d at 446.

The trial court must also determine if the offered evidence is prejudicial. *Trejo v. Keller Industries, Inc.*, 829 S.W.2d 593, 596 (Mo.App.1992). To determine prejudice, the trial court evaluates whether the proffered evidence would tend to mislead or confuse the jury, be cumulative in nature, or require an undue delay or waste of time. *Id.* (citing *Jones v. Terminal R.R. Ass'n of St. Louis*, 242 S.W.2d 473, 477 (Mo.1951)). Exclusion of evidence of other injuries is demanded when the evidence introduced raises many new controversial points, leads to a confusion of issues, or presents undue prejudice disproportionate to its usefulness. *Jones*, 242 S.W.2d at 477(citing JOHN HENRY WIGMORE, 2 WIGMORE ON EVIDENCE, §§§ 442–443, 458 (Chadbourn rev.1979)). Accordingly, we review the exclusion of prior accident evidence, even if relevant, for abuse of discretion. *Lopez*, 26 S.W.3d at 159; *Oldaker v. Peters*, 817 S.W.2d 245, 250 (Mo. banc 1991); *Hess*, 479 S.W.2d at 431. The trial court has broad discretion on questions concerning the admission or exclusion of evidence of similar circumstances. *Pierce*, 769 S.W.2d 769 at 774.

"Where evidence is excluded, the issue is not whether the evidence was 'admissible,' it is whether the trial court abused its discretion in excluding it." *Copeland v. Mr. B's Pool Centers, Inc.*, 850 S.W.2d 380, 381 (Mo.App.1993).

Under these guidelines, our review is limited to whether the trial court determined the relevance of the evidence and whether it bore sufficient resemblance to the injury causing the incident, while it weighed the dangers of undue prejudice and confusion of issues against the factors favoring admissibility. *Richardson v. State Hwy & Transp. Com'n*, 863 S.W.2d 876, 881 (Mo. banc 1993); *Pierce*, 769 S.W.2d at 774; *Budding*, 939 S.W.2d at 425.

In this case the differences between the two events were great. Mr. Dietz observed gas spilling out of a gas tank of an unidentified model of Terramite tractor being driven to an area where the equipment was washed. He could not tell if the gas cap was latched or unlatched. An unidentified Nu–Way employee told him, "It must be a faulty gas cap or something." There was no fire and no injuries. On the other hand, the accident in which plaintiff was injured involved a different Terramite tractor, an overfilled gas tank, an unvented screw in the gas cap, an engine that had died, gasoline shooting and spraying one to two feet in the air after the gas cap was unlatched, a fire, and injuries. The incident observed by and comment heard by Mr. Dietz do not indicate any knowledge on the part of or notice to Nu–Way of a dangerous condition in the gas cap of the T5 tractor.

Plaintiff failed to show sufficient similarity between his accident and the spillage from a gas tank of a different tractor to give notice of a dangerous condition. We therefore, will not disturb the trial court's discretionary ruling excluding the evidence. *See Dillman v. Missouri Highway & Transp.*, 973 S.W.2d 510, 512 (Mo.App. 1998).

### B. *Rebuttal*

Plaintiff next claims that the excluded evidence was admissible "to impeach" the testimony of defendant's three witnesses who, he argues, testified that they had not received any complaints relating to gas caps. At trial plaintiff sought to have this testimony admitted on rebuttal.

Gary Schumer had been the Nu–Way rental manager in 1995. He testified that he had not received complaints from rental customers who had rented the T5 tractor that the engine sputtered or hesitated or that they had to operate the T5 tractor with the gas cap unlatched. Greg Rhomberg, Nu–Way's general manager, did not testify about the subject of complaints about gas caps. Nu–Way's service manager, Pat Shockley, testified to the specific service records of the T5 tractor while it was a rental unit. These records did not record any maintenance or repairs on the T5 tractor's gas cap system, any complaints about that gas cap, or any damage to the gas cap.

A party may introduce evidence to rebut that of his or her adversary, and for this purpose any competent evidence to explain, repel, counteract, or disprove the adversary's proof is admissible. *Bray v. Bi–State Development Corp.*, 949 S.W.2d 93, 101 (Mo.App.1997). The decision to admit rebuttal evidence is within the trial court's discretion. *Id.* " 'Impeachment' is directed to the credibility of a witness for the purpose of discrediting the witness and ordinarily furnishes no factual evidence, whereas 'contradiction' is directed to the accuracy of a witness' testimony and supplies additional evidence." *Budding*, 939 S.W.2d at 426. Contradiction inherently involves some impeachment because any conflicting evidence would serve to question the reliability of

the witness's memory, observation, or honesty. *Waters v. Barbe,* 812 S.W.2d 753, 757 (Mo.App.1991); See generally, 22A WILLIAM A. SCHROEDER, MISSOURI PRACTICE § 621.1 (2d ed.2000).

Mr. Dietz's testimony does not impeach or contradict the accuracy of defendant's witnesses' testimony. It does not explain, repel, counteract, or disprove the referenced evidence. Mr. Dietz's observation of gasoline coming out of a different tractor in the presence of an unidentified Nu–Way employee who opined that it might be a faulty gas cap does not contradict the testimony of Nu–Way employees that they had not received complaints about the gas cap of the T5 tractor while it was a rental unit.

The trial court did not abuse its discretion in excluding the evidence. *See Budding,* 939 S.W.2d at 426. The judgment of the trial court is affirmed.

WILLIAM H. CRANDALL, JR., P.J. and ROBERT G. DOWD, JR., J. concur.